## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES L. EDWARDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. _____** |
| | ) | |
| **WAUKEGAN POLICE OFFICERS** | ) | |
| **MICHAEL QUINN, MARK TKADLETZ and** | ) | |
| **ARTIS YANCEY, the ESTATE OF LOUIS** | ) | **Jury trial demanded.** |
| **MARQUEZ and THE CITY OF WAUKEGAN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

NOW COMES Plaintiff, JAMES L. EDWARDS, by and through his attorneys,

KATHLEEN T. ZELLNER & ASSOCIATES, P.C., and complaining of Defendants,

WAUKEGAN POLICE OFFICERS MICHAEL QUINN, MARK TKADLETZ and ARTIS

YANCEY, the ESTATE OF LOUIS MARQUEZ and THE CITY OF WAUKEGAN, and states

as follows:

### Jurisdiction and Venue

1.      This is a civil rights action brought pursuant to 42 U.S.C. §1983 et seq. to redress

the deprivation under color of law of Plaintiff's rights as secured by the United States

Constitution.

2.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343, and

1367.  Venue is proper under 28 U.S.C. §1391(b) because the events giving rise to Plaintiff's

claims occurred in this judicial district and the parties resided, at the time the events took place,

in this judicial district.

1

**The Parties**

3.      Plaintiff James Edwards (hereinafter referred to as Edwards) was at all times relevant herein a resident and citizen of the State of Illinois.

4.      Defendant Michael Quinn (hereinafter referred to as Defendant Quinn) was at all times relevant herein employed as a police officer in the Waukegan Police Department.

5.      Defendant Mark Tkadletz (hereinafter referred to as Defendant Tkadletz) was at all times relevant herein employed as a police officer in the Waukegan Police Department.

6.      Defendant Artis Yancey (hereinafter referred to as Defendant Yancey) was at all times relevant herein employed as a police officer in the Waukegan Police Department.

7.      Defendant Estate of Louis Marquez in named herein as Defendant because Louis Marquez is, upon information and belief, deceased.  Plaintiff will seek leave to amend the instant complaint naming the Administrator of Louis Marquez's estate once that information is discovered.  At all times relevant herein, Louis Marquez (hereinafter referred to as Officer Marquez) was employed as a police officer in the Waukegan Police Department.

8.      Defendant City of Waukegan is a duly incorporated municipal corporation and at all relevant times was the employer of Defendants Quinn, Tkadletz, Yancey and Officer Marquez.  The City of Waukegan is liable for the wrongful acts of Defendants Quinn, Tkadletz and Yancey, and Officer Marquez, while acting within the scope of their employment, pursuant to its statutory obligation to indemnify them.

9.      Each of the individual Defendants named above engaged in the conduct complained of under color of state law and in the course and scope of his employment as a police officer with the City of Waukegan.

2

### The Sylvia Greenbaum Homicide

10.    On February 11, 1974, patrol officer Lloyd Brantz received an assignment to respond to 3987 East 121st Street in Cleveland, Ohio, to investigate a suspicious vehicle.

11.    Upon arrival Officer Brantz discovered Sylvia Greenbaum's body slumped over the front floorboard of the vehicle. He observed an open purse in the backseat with its contents scattered throughout the interior of the car. The glove compartment was also open and appeared as if someone had looked through it.

12.    It was later learned that Greenbaum was last seen shopping at a shoe store on Shaker Square on February 11, 1974. The police theorized that Greenbaum had parked her car in the parking area on the roof of the store and was approached by her assailant as she was either entering her car or standing by the trunk.

13.    Five .22 caliber bullets were recovered from the victim's body, and three of the five were determined to have been fired from the same weapon.

14.    For over twenty years no one was charged for the Greenbaum murder.

### The Fred Reckling Homicide

15.    On the morning of December 9, 1994, 71-year-old Fred Reckling was found beaten to death inside Grand Appliance, a store owned by Reckling and located in Waukegan, Illinois.

16.    Reckling had worked at the store on December 8, 1994. It was not uncommon for Reckling to return to the store at night after closing to pay bills and process deposits. Reckling had a custom and practice of taking the deposit home when he left the store for the evening.

17.    Reckling would always lock the door with a deadbolt when he returned at night, and would not let anyone in unless he knew them. The store alarm had been set the night of the

3

murder. The store had no signs of forced entry the morning the body was discovered, and a set of keys was found on Reckling's person.

18.     Reckling's body was located towards the back of the store, his head up against a refrigerator and angled downward. The right rear pocket of Reckling's pants had been turned out, and one of his coat pockets was ripped. There was a large amount of blood around the head and upper body, and there were blood spatters and hair on the door.

19.     Forty-one latent fingerprints were recovered from the scene including prints from the refrigerators in the aisle in which Reckling's body was found and inside the front door. Four carpet stains with an appearance consistent with blood were recovered from the front of the store – one to the left of the front door and three in the store's center aisle. Bottles found on the sidewalk in front of the store were fingerprinted, as were checks and deposit slips found on the store counter.

20.     On the date his body was discovered the whereabouts of Reckling's black Lincoln Town Car was unknown. Efforts to locate the car in Waukegan were unsuccessful.

21.     An autopsy revealed that Reckling had three pairs of lacerations to the right side of his head consistent with having been inflicted by a blunt instrument. X-rays showed large fractures underneath the lacerations. Reckling suffered injuries to the left side of his head consistent with being struck, and his left arm was fractured. The cause of death was determined to be multiple blunt force injuries.

22.     No wood splinters were found near the body. No wood splinters or paint was discovered by any of the victim's wounds.

23.     Police conducted an extensive search for the murder weapon. At the time the murder took place it was hypothesized that the weapon was a long and heavy but irregular-

surfaced object. Police searched the store, nearby yards, trash cans and rooftops without locating the weapon.

### The Discovery of Fred Reckling's Car

24. Michael Wales was an employee at the Deerpath Inn in Lake Forest, Illinois. On December 8, 1994, Wales left work at 10:30 p.m. and drove west on Route 60 towards Interstate 294. At approximately 10:45 p.m. Wales drove onto the southbound access ramp and saw a black Lincoln Town Car pulled over to the side. Wales reported to police that he saw a small, "dirty looking" white man wearing a hooded sweatshirt. Another witness, Holly Sunseri, also saw a white individual standing by the black Lincoln Town Car on the same ramp at approximately the same time towards the rear of the car.

25. Jenna Walsh saw a black Lincoln parked on the ramp of I-294 and Route 60 between 11:00 and 11:15 p.m. Another motorist, Jason Howell, reported seeing the same vehicle at approximately 11:40 p.m. Howell witnessed a man bending over by the back bumper. Howell assumed the man was changing a flat on the right rear tire.

26. On the morning of December 9, 1994, James Beake and Gary Rout were working a refuse detail as part of their employment with the Illinois State Toll Highway Authority at the southbound entrance ramp to Route 60. Beak located a box of clothing, a set of jumper cables and a tire jack lying next to the shoulder of the road. About 50-60 feet off the road the two discovered a tire and wheel in a ditch. Several days later Beake discovered Fred Reckling's wallet at that location and contacted police.

27. On December 10, 1994, Margaret Miller lived at 1844 West Warner in Chicago, Illinois. On that date Miller noticed a black Lincoln Town Car parked in front of a building at 1848 Warner. On the 19th of December the car had not been moved from that address. Miller

5

noticed the car had a Waukegan sticker. She called the Department of Streets and Sanitation and the car was removed.

28.     Soon thereafter, it was learned the car was owned by Fred Reckling. The tire and rim discovered by the Route 60 ramp matched the Reckling car which was missing a jack when it was taken into possession.

29.     The Northern Illinois Police Crime Laboratory processed items from the vehicle. Blood stains were located on the driver's seat, the steering wheel and on the foot rail of the driver's side door. Blood genetic marker analysis demonstrated the blood stains could not have come from the victim and were thought to have come from the killer.

## James Edwards' Arrest, Interrogation and Coerced Confessions

30.     On January 4, 1996, James Edwards was arrested by the Waukegan Police Department. At that time there was no probable cause, or even any reasonable basis, to believe that Edwards was involved in any murder. However, at the time he was taken into custody Defendants Quinn, Tkadletz, Yancey and Officer Marquez conspired to frame Edwards by physically and psychologically torturing him to give confessions to crimes he did not commit.

### Interrogation No. 1 – Defendants Quinn and Tkadletz

31.     At approximately 7:55 p.m. on January 4, 1996, Defendants Quinn and Tkadletz took Edwards to an isolated area of the Waukegan police station where construction was taking place. Upon information and belief this area was formerly the juvenile section of the station, which was undergoing renovation at the time Edwards was arrested. The area was filled with dusty, old furniture, and was completely separated from the rest of the police department. The area was not open to the public, and no other members of the police department were present.

32. Prior to questioning, Defendants Quinn and Tkadletz failed to admonish Edwards of his *Miranda* rights. Edwards asked to speak with an attorney and told the Defendants he did not want to speak to them. Defendants Quinn and Tkadletz ignored his requests.

33. Defendants Quinn and Tkadletz began to interrogate Edwards. Defendants Quinn and Tkadletz asked Edwards if he knew anything about any unsolved murders. Edwards denied any such knowledge. The Defendants told Edwards he was lying.

34. After Edwards denied involvement in any unsolved murders, Defendants Quinn and Tkadletz started calling other city police departments where Edwards used to live inquiring as to any unsolved murders during the time period that Edwards resided in that city.

35. One of the police departments the Defendants contacted was the Cleveland Police Department in Cleveland, Ohio. During that conversation Defendants Quinn and Tkadletz learned the details of the Sylvia Greenbaum murder from February 11, 1974.

36. Defendants Quinn and Tkadletz accused Edwards of murdering Sylvia Greenbaum. Edwards denied the accusations. In response to the denials, Defendants Quinn and Tkadletz picked Edwards up by his neck, lifted him off his feet and slammed him against the wall.

37. When Edwards persisted in denying their accusations Defendants Quinn and Tkadletz grabbed Edwards' jaw with the web of their hands between the thumb and index finger and squeezed, applying the maximum amount of pressure possible. Defendants Quinn and Tkadletz further pressed Edwards' temples with their hands causing tremendous physical pain. The physical torture lasted for many hours.

38. Edwards continued to deny involvement in the murder of Sylvia Greenbaum. Defendants Quinn and Tkadletz responded by punching Edwards in the stomach dozens of times.

7

39.     Edwards cried out in physical pain. However, because he was in a completely isolated section of the station he knew that his cries would not be heard. Edwards feared that that Defendants Quinn and Tkadletz would kill him and that nobody would know.

40.     Edwards, who remained handcuffed and defenseless, repeated his requests to speak with an attorney. Defendants Quinn and Tkadletz responded by grabbing their crotches and saying, "Here is your attorney."

41.     Edwards repeatedly requested to use the restroom and to have something to drink. Defendants Quinn and Tkadletz ignored his requests, and forced Edwards to wait several hours before taking him to the bathroom.

42.     Exhausted, Edwards started to fall asleep. Several times Edwards started to nod off, Defendants Quinn and Tkadletz would grab him in a bear hug and splash water in his face to prevent him from sleeping.

43.     Fearing for his life and desperate to stop the physical beatings, Edwards agreed to sign a confession to the Greenbaum murder. The confession is false, and was prepared by Defendants Quinn and Tkadletz based entirely on the information obtained when they called the Cleveland police department.

### Interrogation No. 2 – Defendant Yancey and Officer Marquez

44.     Defendant Yancey and Officer Marquez took over the interrogation, intent on obtaining "confessions" to other unsolved crimes. Yancey moved Edwards from the isolated area he was held in by Defendants Quinn and Tkadletz and into an office.

45.     Edwards again asked to speak to an attorney and told Defendant Yancey and Officer Marquez that he did not want to speak with them. Defendant Yancey and Officer Marquez ignored his requests.

8

46.     Defendant Yancey and Officer Marquez started questioning Edwards. Yancey told Edwards he knew Edwards had perpetrated a robbery at a First of America Bank, and wanted Edwards to confess.

47.     Defendant Yancey grabbed Edwards by the collar and started yelling and screaming in his face. Defendant Yancey, who is black, told Edwards, "Don't think there's any blood between us. You're just a nigger and we need you to confess to something."

48.     During these hours Edwards, exhausted, was not allowed to sleep. Defendants Marquez and Yancey never admonished Edwards of his *Miranda* rights and continued to deny Edwards' requests to remain silent and contact an attorney.

49.     Edwards' wife, Alberta Edwards, arrived at the station. She repeatedly asked to see Edwards but was not permitted to see him and eventually left. At no point was Edwards given the opportunity to make any phone calls or to speak with anybody other than the Defendants and Officer Marquez.

50.     Wanting to end the relentless interrogation, Edwards agreed to confess to First of America Bank robbery to Officer Marquez. Marquez gave him all the details and Edwards gave a second false confession. Video surveillance of the robbery definitively showed that Edwards was not the perpetrator. As a result, charges were never filed against Edwards for that robbery.

51.     Defendant Yancey, wanting to obtain further "confessions" from Edwards, asked Edwards if he knew anything about the murder that occurred at the Grand Appliance in Waukegan, Illinois. Edwards denied knowing anything about the murder.

52.     Defendant Yancey again told Edwards he was lying. Defendant Yancey proposed hypothetical scenarios describing the manner in which he believed Edwards may have murdered Fred Reckling. Edwards continued to deny involvement in the Reckling homicide.

9

### *Interrogation No. 3 – Defendants Quinn and Tkadletz*

53.     Shortly thereafter, Defendants Quinn and Tkadletz arrived and moved Edwards from the office back to the isolated area of the jail that was under construction. At that time the Defendants were armed. Edwards immediately feared for his life, knowing that nobody would hear his cries for help.

54.     Defendants Quinn and Tkadletz told Edwards that Fred Reckling was a "beloved citizen" and "a great guy." They informed Edwards that he would be doing a favor for the cops if he confessed to the murder.

55.     Edwards again denied involvement in the Reckling homicide. Defendants Quinn and Tkadletz responded by hitting Edwards with open hands on the side of his head. The Defendants told Edwards they would arrest and implicate Alberta Edwards in a crime if he did not confess to the Reckling murder.

56.     Defendants Quinn and Tkadletz threatened to murder Edwards and make it look like a suicide. The Defendants told Edwards that if he was found hanging in his cell, "No one would give a damn" and that no one would investigate because of his criminal record.

57.     Defendants Quinn and Tkadletz left and re-entered the room with a false typed statement detailing how Edwards had perpetrated the Reckling homicide. The Defendants told Edwards, "It's time to confess," and told him he would not be leaving until he told them what they wanted to hear.

58.     Defendants Quinn and Tkadletz started to read the statement to Edwards and after each sentence asked Edwards if he agreed. Defendant Quinn informed Edwards, "We're not amateurs. If you say something we don't like you are going to suffer the consequences."

10

59. Edwards continued to deny involvement in the Reckling homicide as Defendants Quinn and Tkadletz read the statement. The Defendants put Edwards in a headlock and punched him.

60. Edwards, growing increasingly more terrified due to the continued attacks and isolation, and fearing that the Defendants would kill him, agreed to sign the statement. The statement is false and based entirely upon information Defendants Quinn and Tkadletz fed to Edwards to frame him.

61. After being further threatened by Defendants Quinn and Tkadletz, Edwards read the coerced confession in front of a video camera which despite being available during the previous 26 hours was not activated until Edwards read the fabricated statement.

## Edwards is Charged with the Murders of Reckling and Greenbaum

62. Based solely on the false confessions coerced and fabricated by the police, Edwards was charged with the murders of Fred Reckling and Sylvia Greenbaum. As there was no physical evidence or eyewitnesses to support such charges, the decisions to charge were based entirely on the illegally coerced statements fabricated by the Defendant Detectives.

## Lack of Corroboration of Edwards' Confession to Reckling Homicide

63. No physical evidence has ever implicated Edwards in the murder of Fred Reckling. None of the forty-one prints recovered from the scene matched him. Edwards' statement was contradicted by the physical evidence at the scene.

64. For example, according to the coerced statement Edwards, who was carrying a wooden walking stick, approached the Grand Appliance and saw keys in the front door. This is completely contrary to Reckling's custom and practice which was to secure the store at night

11

when he was inside counting the deposit. Moreover, Reckling's keys were discovered under his body, not in the front door.

65. The statement indicates that, "[t]he guy was inside, counting money. I pushed the door open and he told me the store was closed. I saw a bag at his side. I pretended to have a gun and grabbed at the bag." The statement fails to account for how Edwards could pretend to have a gun in one hand while reaching for the bag with the other, all while holding the three-and-a-half foot long stick.

66. Edwards' statement indicates that he swung the stick and hit the victim on the side of the face. However, the victim did not show any evidence of having been struck on the side of the face.

67. Per the statement, Edwards and the victim struggled over the bag until Edwards hit him with the stick a number of times. The statement says that Edwards went through the bag and took between $1,300 and $1,600 and left the bag. However, it is undisputed that $1,800 was actually stolen, and the bank bag was not at the scene and was never located.

68. No splinters consistent with the supposed murder weapon were recovered at the scene.

69. Other inconsistencies riddle the statement. Per the statement Edwards got into Reckling's car and he drove to Chicago. The car got "fucked up" so he pulled over and fixed the tire, leaving the flat on the side of the road. This contradicts the eyewitnesses who saw the car pulled over on the Route 60 ramp, well north of Chicago. Also, while the tire jack, jumper cables and a box of clothes were found on the shoulder, the tire was moved 50 to 60 feet off the road and into a ditch, and not on the side of the road.

70.     Multiple witnesses who saw Reckling's vehicle witnessed a white individual fixing a flat tire which does not match the description of Edwards, who is black. These witnesses reported seeing the vehicle on the side of the road over the time span of an hour. This does not match Edwards' statement that it took him only five minutes to fix the flat.

71.     According to the statement, Edwards parked in a parking lot off of the street. The vehicle was in fact discovered parked on Warner Street, not in any parking lot.

72.     The statement describes Edwards leaving the car from Warner Street and taking a cab seventeen miles to Fluky's Bar at 86th and Cottage Grove to get drugs. This claim was completely refuted by the fact that Fluky's Bar closed ten years prior to the night of the incident, and the area around 86th and Cottage Grove had been voted dry four years prior to the Reckling murder. This single false fact alone undermines the veracity of the confession.

73.     The statement omits the fact that Reckling's wallet was taken and his pants pockets searched. The statement omits that other evidence at the scene showing a struggle near the front of the store, including a ladder that was discovered lying on the floor and a broken fluorescent bulb next to the front door. The statement does not explain how the store alarm, which had been activated by the time police arrived the following morning, was triggered.

74.     Certain that the blood stains in the victim's vehicle would implicate Edwards, upon information and belief the police directed the crime lab to compare the stains recovered from the victim's vehicle to a standard collected from Edwards. The stains did not match Edwards' blood type.

13

## Evidence Fabricated to Corroborate the False Charges

75. Through counsel, Edwards filed a motion to suppress his statements on the basis that the statements were not voluntary and because he was beaten and denied his requests to remain silent and speak with an attorney.

76. The Defendant Detectives continued the deception at the motion to suppress hearing. The Defendant Detectives falsely testified that Edwards did not invoke his right to remain silent or his right to speak with an attorney. The Defendants also denied beating Edwards or threatening him with further physical harm if he did not confess.

77. There was no documented evidence that the Defendant Detectives gave Edwards his *Miranda* warnings prior to the interrogation. Incredibly, a different officer testified that he saw a report memorializing the fact that such warnings had been given but somehow the report had been lost.

78. Edwards did not testify at the motion to suppress hearing and the motion was denied by the trial court because the prosecution's version of events was undisputed. Edwards was not allowed to testify at the hearing by his attorney.

79. The Defendant Detectives testified similarly at the motion to suppress hearing prior to the Ohio trial on the Greenbaum murder. Again, the Defendant Detectives falsely testified that Edwards did not invoke his right to remain silent or his right to speak with an attorney. The Defendant Detectives also denied beating Edwards and threatening him with further physical mistreatment if he did not confess.

80. On October 31, 1996, Edwards was convicted of the Reckling homicide and sentenced to life imprisonment and on August 28, 1997, he was convicted of the Greenbaum homicide and sentenced to life imprisonment.

14

81.     The convictions were based entirely on the coerced confessions. As one juror on the Reckling case was recently quoted in the Chicago Tribune, "There wasn't any evidence. It was basically based on [Edwards's] confession."

### DNA Evidence Clears Edwards of the Reckling Homicide

82.     On June 20, 2005, nine and a half years after his conviction for the Reckling homicide, Edwards filed a *pro se* "Motion for Forensic Testing" pursuant to 725 ILCS 5/116-3. The motion sought to have the blood evidence from Reckling's car tested for DNA and for any obtained profile(s) to be run through the CODIS database.

83.     On May 26, 2010, the Supreme Court of Illinois issued a supervisory order, directing that the testing be performed.

84.     On or about June 20, 2011, Edwards' counsel was informed that the profile obtained from the blood stains in the victim's vehicle excluded Edwards and matched a profile in the CODIS database. Upon information and belief, the CODIS match is of an individual who was arrested just weeks after the Reckling homicide in connection with armed robberies in Wilmette, Illinois, and Evanston, Illinois, and was subsequently sentenced to 30 years incarceration for these crimes.

85.     This match completely exonerates Edwards of the Reckling homicide. No plausible explanation exists for this individual's DNA being present in the blood stain taken from the victim's car apart from his perpetrating the murder of Fred Reckling.

### Charges Against Edwards Dismissed

86.     On May 15, 2012, the Lake County State's Attorney's Office announced that Hezekiah D. Whitfield had been charged with the murder of Fred Reckling. A representative

15

from the State's Attorney's Office indicated that the blood found in Reckling's car, in addition to blood found at the crime scene, matched Whitfield's DNA.

87.     On May 29, 2012, the Circuit Court of Lake County, the Honorable Judge John T. Phillips, granted Edwards' petition for post-conviction relief, vacating Edwards' conviction. On that same date upon motion of the State the charges were nolle prossed.

88.     For approximately 187 months Edwards stood convicted of and imprisoned for a murder he did not commit, based entirely on a fabricated, coerced confession.

**James Edwards' Damages**

89.     As a direct result of the Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Edwards sustained injuries and damages including pain and suffering, severe mental anguish, emotional distress, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

**COUNT I**

**(42 U.S.C. §1983 – Coerced Confession:  Fourteenth Amendment)**

**(Defendants Quinn, Tkadletz, Yancey and Estate of Louis Marquez)**

90.     Plaintiff re-alleges paragraphs 1-89 of this Complaint as if fully set forth herein.

91.     In the manner more fully set forth above, Defendants Quinn, Tkadletz and Yancy, and Officer Marquez (collectively the "Defendant Detectives"), used unjust physical and

16

psychological coercion against Plaintiff in an attempt to coerce him to confess to a crime he did not commit.

92.     As a result of the Defendant Detectives' misconduct, Plaintiff was in fact coerced into falsely confessing to the murder of Fred Reckling.

93.     Plaintiff's coerced confession was used against him, in that the confession resulted in charges being initiated against him and resulted in his conviction for the murder of Fred Reckling.

94.     As a direct and proximate result of the Defendant Detectives' misconduct, Plaintiff has suffered and continues to suffer great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

95.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter judgment in his favor and against Defendants Quinn, Tkadletz, Yancey and the Estate of Louis Marquez, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of these Defendants as well as any other relief this Court deems just and appropriate.

## COUNT II

### (42 U.S.C. §1983 Substantive Due Process:  Shocks the Conscience)

### (Defendants Quinn and Tkadletz)

96.     Plaintiff re-alleges paragraphs 1-95 of this Complaint as if fully set forth herein.

97.     In a manner more fully set forth above, Defendants Quinn and Tkadletz used physical torture as a means of coercing a statement from Plaintiff.  This includes lifting Plaintiff by his neck and slamming him against a wall, squeezing his mouth and temples and punching him repeatedly in the stomach.

98.     Defendants Quinn and Tkadletz then threatened to hang Plaintiff and make it look like a suicide, telling him that nobody "would give a damn" if he was discovered hanging in his cell and no investigation would take place because of his record.

99.     These actions by Defendants Quinn and Tkadletz shock the conscience and violate substantive due process.

100.    As a direct and proximate result of the Defendant Quinn's and Tkadletz's misconduct, Plaintiff has suffered and continues to suffer great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

101.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter judgment in his favor and against Defendants Quinn and Tkadletz, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of these Defendants as well as any other relief this Court deems just and appropriate.

18

## COUNT III

### (42 U.S.C. §1983: 5th and 14th Amendments)

### (Defendants Quinn, Tkadletz, Yancey and Estate of Louis Marquez)

102.    Plaintiff re-alleges paragraphs 1-101 of this Complaint as if fully set forth herein.

103.    In the manner more fully set forth above, Plaintiff was denied access to legal counsel for the duration of his interrogation as well as his right to remain silent, notwithstanding requests for the same.

104.    In the manner more fully set forth above, the Defendant Detectives further threatened to arrest Plaintiff's wife as an accomplice to burglary if he did not confess to the murder. As a result of this and the other misconduct described in this Complaint, Plaintiff was forced to incriminate himself falsely against his will.

105.    Plaintiff's coerced false statements were used against him to initiate charges, as evidence at trial, and to secure his conviction.

106.    As a direct and proximate result of the Defendant Detectives' misconduct, Plaintiff has suffered and continues to suffer great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

107.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter judgment in his favor and against Defendants Quinn, Tkadletz, Yancey and the Estate of Louis Marquez, awarding compensatory damages, costs, and attorney's fees along with punitive

damages against each of these Defendants as well as any other relief this Court deems just and appropriate.

## COUNT IV

### (42 U.S.C. §1983 Failure to Intervene)

### (Defendants Quinn, Tkadletz, Yancey and Estate of Louis Marquez)

108.    Plaintiff re-alleges paragraphs 1-107 of this Complaint as if fully set forth herein.

109.    In the manner described above, during the constitutional violations described above, one or more of the Defendant Detectives stood by without intervening to prevent the misconduct. The Defendant Detectives had a reasonable opportunity to prevent this harm, but failed to do so.

110.    As a direct and proximate result of the Defendant Detectives' misconduct, Plaintiff has suffered and continues to suffer great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

111.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter judgment in his favor and against Defendants Quinn, Tkadletz, Yancey and the Estate of Louis Marquez, awarding compensatory damages, costs, and attorney's fees along with punitive damages against each of these Defendants as well as any other relief this Court deems just and appropriate.

## COUNT V

## (42 U.S.C. §1985 Conspiracy)

### (Defendants Quinn, Tkadletz, Yancey and Estate of Louis Marquez)

112.    Plaintiff re-alleges paragraphs 1-111 of this Complaint as if fully set forth herein.

113.    In a manner more fully set forth above, the Defendant Detectives together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves for the purpose of depriving Plaintiff of his constitutional rights and accomplishing an unlawful purpose by unlawful means.

114.    In furtherance of this conspiracy or conspiracies, the Defendant Detectives, acting in concert with other co-conspirators, committed the overt acts as set forth above including, but not limited to: isolating Plaintiff, preventing him from access to legal counsel, ignoring his requests to remain silent, coercing his confession, manipulating and falsifying police reports, and knowingly presenting fabricated evidence to initiate proceedings against Plaintiff maliciously.

115.    Said conspiracy or conspiracies and overt acts were continued from on or about January 4, 1996, through to the present.

116.    As a direct and proximate result of the Defendant Detectives' misconduct, Plaintiff has suffered and continues to suffer great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

117.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter judgment in his favor and against Defendants Quinn, Tkadletz, Yancey and the Estate of Louis

Marquez, awarding compensatory damages, costs, and attorney's fees along with punitive

damages against each of these Defendants as well as any other relief this Court deems just and

appropriate.

## COUNT VI

### (State Law Claim - Intentional Infliction of Emotional Distress)

### (Defendants Quinn, Tkadletz, Yancey and Estate of Louis Marquez)

118.    Plaintiff re-alleges paragraphs 1-117 of this Complaint as if fully set forth herein.

119.    In a manner more fully set forth above, the acts and conduct of the Defendant

Detectives was extreme and outrageous. The Defendant Detectives intended to cause, or were in

reckless disregard of the probability that their conduct would cause, severe emotional distress to

Plaintiff.

120.    Said actions were undertaken with malice, willfulness, and with reckless

indifference to the rights of Plaintiff.

121.    As a direct and proximate result of Defendant Detectives' wrongful acts, Plaintiff

suffered and continues to suffer damages, including severe emotional distress and anguish.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter

judgment in his favor and against Defendants Quinn, Tkadletz, Yancey and the Estate of Louis

Marquez, awarding compensatory damages, costs, and attorney's fees against each of these

Defendants as well as any other relief this Court deems just and appropriate.

## COUNT VII

### (State Law Claim – Malicious Prosecution)

### (Defendants Quinn, Tkadletz, Yancey and Estate of Louis Marquez)

122. Plaintiff re-alleges paragraphs 1-121 of this Complaint as if fully set forth herein.

123. In a manner more fully set forth above, the Defendant Detectives initiated and/or continued a malicious prosecution against James Edwards, all without probable cause. The Defendant Detectives were each instrumental in the initiation and perpetuation of the prosecution of James Edwards. The Defendant Detectives acted with malice.

124. The prosecution was terminated in Plaintiff's favor on May 29, 2012 when all the charges were dropped.

125. The Defendant Detectives are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

126. As a direct and proximate result of the Defendant Detectives' misconduct, Plaintiff has suffered and continues to suffer great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter judgment in his favor and against Defendants Quinn, Tkadletz, Yancey and the Estate of Louis Marquez, awarding compensatory damages, costs, and attorney's fees against each of these Defendants as well as any other relief this Court deems just and appropriate.

## COUNT VIII

### (State Law Claim – Conspiracy)

### (Defendants Quinn, Tkadletz, Yancey and Estate of Louis Marquez)

127.    Plaintiff re-alleges paragraphs 1-126 of this Complaint as if fully set forth herein.

128.    In a manner more fully set forth above, the Defendant Detectives together reached an understanding, engaged in a course of conduct, and otherwise jointly acted and/or conspired among and between themselves to coerce a confession from Plaintiff, and to intentionally inflict severe emotional distress.

129.    In furtherance of this conspiracy or conspiracies, the Defendant Detectives committed the overt acts as set forth above including, but not limited to:  isolating Plaintiff, preventing him from access to legal counsel, ignoring his requests to remain silent, coercing his confession, manipulating and falsifying police reports, and knowingly presenting fabricated evidence to initiate proceedings against Plaintiff maliciously.

130.    Said conspiracy or conspiracies and overt acts were continued from on or about January 4, 1996, through to the present.

131.    As a direct and proximate result of the Defendant Detectives' misconduct, Plaintiff has suffered and continues to suffer great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other consequential damages, as well as loss of liberty.

WHEREFORE, Plaintiff, James Edwards, respectfully requests that this Court enter judgment in his favor and against Defendants Quinn, Tkadletz, Yancey and the Estate of Louis Marquez, awarding compensatory damages, costs, and attorney's fees against each of these Defendants as well as any other relief this Court deems just and appropriate.

## COUNT IX

### (745 ILCS 10/9-102 – Indemnification – City of Waukegan)

132.    Plaintiff re-alleges paragraphs 1-131 of this Complaint as if fully set forth herein.

133.    Defendant City of Waukegan employed each of the Defendant Detectives at all times relevant to this Complaint, as set forth above.

134.    All of the individually named Defendant Detectives were at all relevant times acting within the course and scope of their employment.

135.    Pursuant to 745 ILCS 10/9-102, Defendant City of Waukegan  is liable to pay all judgments and settlements entered against any of its employees for the claims asserted herein.

WHEREFORE, pursuant to 745 ILCS 10/9-102, Plaintiff, James Edwards, demands judgment against Defendants City of Waukegan in the amounts awarded to Plaintiff against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs and attorney's fees.

## COUNT X

### (Respondeat Superior – Defendant City of Waukegan)

136.    Plaintiff re-alleges paragraphs 1-135 of this Complaint as if fully set forth herein.

137.    At all times relevant to this complaint Defendants Quinn, Tkadletz, Marquez and Yancey acted as agents of, and in the scope of their employment with, Defendant City of Waukegan.

138.    Defendant City of Waukegan is liable for the state law torts of its employees under the doctrine of *respondeat superior.*

WHEREFORE, Plaintiff, James Edwards, demands judgment against Defendant City of

Waukegan for compensatory damages, plus the costs of this action and such other relief as this

Court deems equitable and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b)

on all issues so triable.

Respectfully Submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner
Atty No: 6184574
Kathleen Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
Phone: (630) 955-1212
Fax: (630) 955-1111
Email: kathleen.zellner@gmail.com